THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: June 5, 2019

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

*Performance Open Wheel Racing, Inc.*
*v.*
*United States Auto Club Inc.*

_____

Opposition No. 91229632

_____

James E. DeFranco of DeFranco & Bradley PC,
    for Performance Open Wheel Racing, Inc.

Caitlin R. Byczko and Dwight D. Lueck of Barnes & Thornburg LLP,
    for United States Auto Club Inc.

_____

Before Bergsman, Shaw and Lynch, Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

United States Auto Club Inc. (Applicant) seeks registration on the Principal Register under the provisions of Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f), of the term NATIONAL MIDGET SERIES, in standard characters, for "entertainment services, namely, arranging and conducting automobile racing events; and sanctioning, supervising, and officiating of automobile races," in

International Class 41.[1] Applicant disclaimed the exclusive right to use the word "Series."

Although Applicant did not claim ownership of any other registrations during the prosecution of its application, during its testimony period, Applicant introduced the prosecution history file for its previously-registered mark NATIONAL MIDGET CHAMPIONSHIP, in standard characters, issued on the Principal Register under the provisions of Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f), for "entertainment services, namely, arranging and conducting automobile racing events; and sanctioning, supervising, and officiating of automobile races," in Class 41.[2]

Performance Open Wheel Racing, Inc. (Opposer) filed a Notice of Opposition against the registration of Applicant's mark on the grounds that NATIONAL MIDGET SERIES for automobile racing events is generic and, in the alternative, that it is merely descriptive and it has not acquired distinctiveness.

In its Answer, Applicant denied the salient allegations in the Notice of Opposition, and alleged the Affirmative Defense that Opposer will not be damaged by the registration of NATIONAL MIDGET SERIES because Applicant is the owner of the above-noted Registration No. 3753495 for the mark NATIONAL MIDGET

---

[1] Application Serial No. 86789119, filed on October 15, 2015, under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), based on Applicant's claim of first use anywhere and first use in commerce as of 1956.

[2] Registration No. 3753495, registered March 2, 2010; Sections 8 and 15 declarations accepted and acknowledged. 11 TTABVUE 6-136.

2

CHAMPIONSHIP for the same services. *See Morehouse Mfg. Corp. v. J. Strickland & Co.,* 407 F.2d 881, 160 USPQ 715, 717 (CCPA 1969).

## I. The Record

The record includes the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), Applicant's application file. The parties introduced the testimony and evidence listed below:

A. Opposer's testimony and evidence.

1. Testimony deposition of Kenneth Lee Brown, Opposer's President and sole owner;[3] and

2. Rebuttal testimony declarations of the people listed below:

   a. Tommy Cason, racetrack promoter at Jacksonville Speedway;[4]

   b. Kevin Dobson, Director of Midwest Open Wheel Association;[5]

   c. Robert Guess, Treasurer of Grundy County Speedway;[6]

   d. Harlen Kittleson, Board Member of the Badger Auto Racing Association;[7]

   e. Bob Koltes, President of Angell Park Speedway;[8]

   f. Al Lower, owner of A.E.D. Motorsport Products;[9]

---

[3] 33 TTABVUE.

[4] 28 TTABVUE 3.

[5] 28 TTABVUE 5.

[6] 28 TTABVUE 7.

[7] 28 TTABVUE 9.

[8] 28 TTABVUE 11.

[9] 28 TTABVUE 13.

       g.  Jim McDougal, owner of Factor 1 Racing, Inc.;[10]

       h.  Dan Robinson, race track promoter at Lucas Oil Speedway;[11]

       i.  Dennis Shrout, owner of Grain Valley Speedway;[12] and

       j.  Brian Thompson, racetrack promoter at Belle-Clair Speedway.[13]

B. Applicant's testimony and evidence.

   1.  Testimony Declaration of Kevin Miller, Applicant's President and Chief Executive Officer;[14]

   2.  Notice of reliance on the following items:

       a.  The file history of Applicant's Registration No. 3753495 for the mark NATIONAL MIDGET CHAMPIONSHIP;[15] and

       b.  Documents printed from the Internet purportedly showing the use of NATIONAL MIDGET SERIES;[16]

   3.  Testimony declarations of the people listed below:

       a.  Jay Frye, President of INDYCAR;[17]

---

[10] 28 TTABVUE 15.

[11] 28 TTABVUE 17.

[12] 28 TTABVUE 19. Opposer introduced the Shrout declaration a second time at 29 TTABVUE.

[13] 28 TTABVUE 21.

[14] 22 TTABVUE. The portions of the Miller Declaration designated confidential are posted at 23 TTABVUE.

[15] 11 TTABVUE 6-136.

[16] 11 TTABVUE 137-188.

[17] 12 TTABVUE.

b. Nick Craw, former President and Chief Executive Officer of the Automobile Competition Committee for the United States and Senate President of the Federation Internationale de l'Automobile;[18]

c. Reece O'Connor, track promoter and owner of Kokomo Speedway;[19]

d. Tracy Hines, professional racecar driver;[20]

e. Shane Golobic, professional racecar driver;[21]

f. Jerry Coons, Jr., professional racecar driver;[22]

g. Bob East, midget car builder and team manager;[23]

h. Chad Boat, professional racecar driver;[24]

i. Gary Stanton, owner of Stanton Racing Engines;[25] and

4. Notice of reliance on documents printed from the Internet.[26]

## II.  Background

"The Total Novice's Guide to Dirt Track Racing," (AxleAddict.com) (December 4, 2016) describes midget car racing as follows:

> Midget Sprint Car
>
> A midget packs a lot of power into a small package and these cars feature a very high power-to-weight ratio and

---

[18] 13 TTABVUE.

[19] 14 TTABVUE.

[20] 15 TTABVUE.

[21] 16 TTABVUE.

[22] 17 TTABVUE.

[23] 18 TTABVUE.

[24] 19 TTABVUE.

[25] 10 TTABVUE.

[26] 24 TTABVUE.

typically use four cylinder engines. Midget engines have 300 to 400 horsepower while only weighing 1,000 lbs., which makes these cars extremely fast and very dangerous. Full safety roll cages are mandatory for this exact reason. They are designed to run relatively short sprint style races seldom exceeding 50 laps.[27]

A midget racecar is displayed below:[28]



### III.    Standing

Standing is a threshold issue that must be proven by a plaintiff in every inter partes case. To establish standing in an opposition or cancellation proceeding, a plaintiff must show "both a 'real interest' in the proceedings as well as a 'reasonable basis' for its belief of damage." *Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014) (quoting *ShutEmDown Sports, Inc., v. Lacy,* 102 USPQ2d 1036, 1041 (TTAB 2012)); *Ritchie v. Simpson,*

---

[27] Miller Testimony Decl. Exhibit B (22 TTABVUE 65); *see also* Exhibit E (22 TTABVUE 84); Brown Testimony Dep., pp. 6-7 (33 TTABVUE 9-10). The Wikipedia.org entry for "Midget Car Racing" in the prosecution history of Applicant's Registration No. 3753495 for the mark NATIONAL MIDGET CHAMPIONSHIP provides the following:

> Midget cars … is a class of racing cars. The cars are very small with a very high power-to-weight ratio and typically used four cylinder engines.

11 TTABVUE 121.

[28] Miller Testimony Dep., Exhibit 2 (33 TTABVUE 74).

170 F.3d 1092, 50 USPQ2d 1023, 1025 (Fed. Cir. 1999); *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982). The Court of Appeals for the Federal Circuit has enunciated a liberal threshold for determining standing in Board proceedings. *Ritchie v. Simpson*, 50 USPQ2d at 1030.

When challenging a term as descriptive or generic, a plaintiff may establish standing by showing that it is engaged in the sale or offering of services the same as or related to those covered by the challenged mark. *See Eastman Kodak Co. v. Bell & Howell Document Mgmt. Prods. Co.*, 23 USPQ2d 1878, 1879 (TTAB 1992), *aff'd*, 994 F.2d 1569, 26 USPQ2d 1912 (Fed. Cir. 1993); *Binney & Smith Inc. v. Magic Marker Indus., Inc.*, 222 USPQ 1003, 1010 (TTAB 1984).

The record establishes that Opposer sanctions and supervises automobile races. Kenneth Lee Brown, Opposer's President and sole owner, testified that Opposer sanctions and promotes midget car and sprint racing.[29] In fact, Applicant sent Opposer a cease and desist letter demanding that Opposer stop using NATIONAL MIDGET SERIES to promote and sanction automobile races.[30] All of Opposer's rebuttal witnesses testified that they are aware that Opposer "has used the phrase NATIONAL MIDGET SERIES for its arranging and conducting of automobile racing events and sanctioning, supervising, and officiating of automobile races across the country since as early as 2004."[31] Thus, there is no doubt that Opposer is engaged in

---

[29] Brown Testimony Dep., p. 7 (33 TTABVUE 10).

[30] Brown Testimony Dep. Exhibit 3 (33 TTABVUE 75).

[31] Paragraph No. 7 of Opposer's Rebuttal Declarations (28 TTABVUE).

the same services as those covered by the challenged mark. Specifically, Opposer and Applicant are competitors, and Opposer has a legitimate interest in preventing Applicant from gaining an alleged unfair competitive advantage by registering a purportedly generic or merely descriptive term for arranging and conducting automobile racing events and sanctioning, supervising, and officiating of automobile races, and that Opposer has standing.

Applicant, in its brief, does not challenge Opposer's standing.

## IV. Whether NATIONAL MIDGET SERIES is generic?

A generic term "is the common descriptive name of a class of goods or services." *Royal Crown Co. v. Coca-Cola Co.*, 892 F.3d 1358, 127 USPQ2d 1041, 1045 (Fed. Cir. 2018) (quoting *H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.*, 782 F.2d 987, 228 USPQ 528, 530 (Fed. Cir. 1986)). In an opposition, it is Opposer's burden to prove that NATIONAL MIDGET SERIES is generic by a preponderance of the evidence. *See Frito-Lay N. Am. v. Princeton Vanguard, LLC,* 124 USPQ2d 1184, 1187 (TTAB 2017) (citing *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.,* 786 F.3d 960, 114 USPQ2d 1827, 1830 (Fed. Cir. 2015)). "The critical issue in genericness cases is whether members of the relevant public primarily use or understand the term … to refer to the genus of goods or services in question." *Royal Crown*, 127 USPQ2d at 1046 (quoting *Marvin Ginn*, 228 USPQ at 530); *Princeton Vanguard,* 114 USPQ2d at 1830.

The Federal Circuit has set forth a two-step inquiry to determine whether a mark is generic: First, what is the genus (category or class) of goods or services at issue?

Second, is the term sought to be registered understood by the relevant public primarily to refer to that genus of goods or services? *Marvin Ginn*, 228 USPQ at 530. The perception of the relevant public is the chief consideration in determining whether a term is generic. *See Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 114 USPQ2d at 1833. Evidence of the public's understanding of a term may be obtained from "any competent source, such as consumer surveys, dictionaries, newspapers and other publications." *Id.* at 1830 (quoting *In re Northland Aluminum Prods., Inc.*, 777 F.2d 1556, 227 USPQ 961, 963 (Fed. Cir. 1985)). "[A] term can be generic for a genus of goods or services if the relevant public … understands the term to refer to a key aspect of that genus." *Royal Crown*, 127 USPQ2d at 1046 (quoting *In re Cordua Rests., Inc.*, 823 F.3d 594, 118 USPQ2d 1632, 1637 (Fed. Cir. 2016)).

With respect to the first part of the *Marvin Ginn* inquiry, the genus may be defined by the services identified in the application. *See In re Reed Elsevier Props. Inc.*, 482 F.3d 1376, 82 USPQ2d 1378, 1380 (Fed. Cir. 2007); *Magic Wand Inc. v. RDB Inc.*, 940 F.2d 638, 19 USPQ2d 1551, 1552 (Fed. Cir. 1991) (a proper genericness inquiry focuses on the identification set forth in the application or certificate of registration). Applicant, in its brief, agrees that the genus is defined by its description of services.[32] Kevin Miller, Applicant's President and Chief Executive Officer, testified that Applicant supervises, sanctions, arranges and conducts automobile racing.[33] Also, all of Applicant's third-party witnesses testified that they "recognize

---

[32] Applicant's Brief, p. 4 (38 TTABVUE 9). Opposer did not discuss the genus of the services in its brief.

[33] Miller Testimony Decl. ¶¶5-8 (22 TTABVUE 3).

NATIONAL MIDGET SERIES as a trademark and source indicator for [Applicant] in connection with arranging and conducting automobile racing events and the sanctioning, supervising, and officiating of automobile races."

We find that the genus is defined by Applicant's description of services: "entertainment services, namely, arranging and conducting automobile racing events; and sanctioning, supervising, and officiating of automobile races." This includes the subcategory of automobile races for midget racing cars.

The second part of the *Marvin Ginn* inquiry requires us to consider whether the term sought to be registered is understood by the relevant public primarily to refer to that genus of services. The relevant public encompasses "actual [and] potential purchasers of . . . goods or services" identified in the application or registration. *The Loglan Inst. Inc. v. The Logical Language Grp. Inc.*, 962 F.2d 1038, 22 USPQ2d 1531, 1533 (Fed. Cir. 1992) (citation omitted); *Sheetz of Del., Inc. v. Doctor's Assocs. Inc.*, 108 USPQ2d 1341, 1351 (TTAB 2013). Based on a review of the testimony and evidence, especially the third-party declarations introduced by both parties, the relevant public is automobile racing fans, racetrack promoters, racetrack owners, professional racecar drivers, midget car builders and owners, and automobile racing associations.

We now turn to the manner in which the relevant consumers perceive the term NATIONAL MIDGET SERIES when it is used in connection with the identified services.

The words comprising the designation NATIONAL MIDGET SERIES have the following definitions:

10

- The word "National" is defined, inter alia, as an adjective meaning "concerning or encompassing an entire nation: *a national radio network.*"[34]

- The word "Midget" is defined, inter alia, as "very small or of a class below the usual size."[35] As noted above in footnote No. 27, the Wikipedia.org entry for "Midget Car Racing" in the prosecution history of Applicant's Registration No. 3753495 for the mark NATIONAL MIDGET CHAMPIONSHIP provides that "Midget cars … [comprise] a class of racing cars."[36]

- The word "Series" is defined, inter alia, as "a number of games, contests, or sporting events, with the same participants, considered as a unit: *The two baseball clubs played a five-game series.*"[37]

The testimony of Kenneth Lee Brown, Opposer's President and owner, supports these definitions in the relevant industry.

> Q. In the racing industry, does the term "midget" when it refers to a car have a specific meaning or denote something specific?
>
> A. It denotes that it is a type of car which is a four-wheel frame car with a four-cylinder motor.
>
> Q. And the term "series" - - does that denote not [sic] anything in the racing world?

---

[34] Dictionary.com based on the RANDOM HOUSE UNABRIDGED DICTIONARY (2019). The Board may take judicial notice of dictionary definitions, including online dictionaries that exist in printed format. *In re Cordua Rests. LP*, 110 USPQ2d 1227, 1229 n.4 (TTAB 2014), *aff'd,* 823 F.3d 594, 118 USPQ2d 1632 (Fed. Cir. 2016); *Threshold.TV Inc. v. Metronome Enters. Inc.*, 96 USPQ2d 1031, 1038 n.14 (TTAB 2010); *In re Red Bull GmbH*, 78 USPQ2d 1375, 1378 (TTAB 2006).

[35] Dictionary.com based on the RANDOM HOUSE UNABRIDGED DICTIONARY (2019).

[36] 11 TTABVUE 121.

[37] *Id.*

A.  It denotes that it is basically - - the series has a start and end of racing, and then collectively the drivers collect points and that is how you become a champion of a series.

Q.  So there would be different races?

A.  There will be different races within the series throughout. If the series starts in May and ends in October, those races are your series, and then you collect points depending on the position you finish to become the champion of the series.

Q.  So the connection between the individual races is the point tabulation and a total of the different races within that series?

A.  Correct.

Q.  And the term "national" - - does that have any connotation in the racing industry?

A.  "National" refers that we are running across the United States.[38]

The term "national" generally has been found to be descriptive. *See In re Chamber of Commerce of the U.S.*, 675 F.3d 1297, 102 USPQ2d 1217 (Fed. Cir. 2012) (NATIONAL CHAMBER merely descriptive of nationwide online directory services featuring information regarding local and state chambers of commerce and business and regulatory data analysis services for nationally promoting the interests of businesspersons or industry); *see also* TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 1209.03(o) (2018). We are not convinced on this record that "national" is generic for the services. Thus, although each word in the mark retains its descriptive or generic significance in connection with automobile racing when

---

[38] Brown Testimony Dep., pp. 9-10 (33 TTABVUE 12-13).

combined as NATIONAL MIDGET SERIES, not each of those terms has been shown to be generic for the services and, accordingly, we cannot say that the meaning of the whole is generic based on the dictionary definitions alone.

We also consider evidence of use of the combined term when such evidence is presented. Opposer introduced excerpts from materials purportedly displaying NATIONAL MIDGET SERIES used generically. For example,[39]

- Brown Exhibits 9-11 show NATIONAL MIDGET SERIES used in connection with events sponsored by Opposer, Applicant and Lucas Oil Products, Inc.[40] An excerpt from Brown Exhibit 11 (an excerpt from Applicant's website) is representative and reproduced below.[41] The logos of the parties (POWR and USAC) appear above the Lucas Oil Products Inc. logo.

---

[39] Brown Testimony Deposition Exhibit 5 is an article, circa 1999, from an unidentified publication referring to the United Midget Auto Racing Association (U.M.A.R.A.) National Midget Division Champion and the Illinois State Midget Championship. Brown Testimony Dep., p. 17 and Exhibit 14 (33 TTABVUE 20 and 90). It does not refer to a NATIONAL MIDGET SERIES.

[40] Brown Testimony Dep., pp. 14-16 and Exhibit 9 (33 TTABVUE 17-19 and 85-87).

[41] 33 TTABVUE 87. Similar uses appear in Opposer's Exhibits 15-21, 25-26 (33 TTABVUE 91-97, 101-102).



- Brown Exhibit 14 is an excerpt from Applicant's website for a co-sanctioned event displaying the term NATIONAL MIDGET SERIES.[42] An excerpt from the webpage is reproduced below. The term NATIONAL MIDGET SERIES appears in the lower right-hand corner of the webpage in the shield featuring the logos of Opposer and Lucas Oil Products.

---

[42] Brown Testimony Dep., p. 17 and Exhibit 14 (33 TTABVUE 20 and 90).



The manner of use of "NATIONAL MIDGET SERIES" in these examples is more in the nature of trademark use alongside the trademarks of Applicant's co-sponsors for these races. Opposer's third-party witnesses, individuals involved in various aspects of the automobile racing industry, all testified that "NATIONAL MIDGET

15

SERIES is a phrase commonly used by multiple organizations in connection with arranging and conducting automobile racing events and the sanctioning, supervising and officiating of automobile races," and that Opposer and Applicant have used the term NATIONAL MIDGET SERIES for co-sanctioned events as recently as 2017. Although the witnesses testified that "NATIONAL MIDGET SERIES is a phrase commonly used by multiple organizations in connection with arranging and conducting automobile racing events and the sanctioning, supervising and officiating of automobile races," the witnesses did not identify any other organizations except the parties. Also, when the witnesses testified that the "general public does not perceive the phrase NATIONAL MIDGET SERIES is a distinctive source indicator for any one particular automobile racing sanctioning body,"[43] they did not explain why they reached this conclusion which, because they did not identify any other organizations that use NATIONAL MIDGET SERIES, affects the probative value of their conclusions.

On the other hand, Applicant's third-party witnesses, individuals involved in various aspects of the automobile racing industry, all testified that "'NATIONAL MIDGET SERIES' is not a phrase that is commonly used by other organizations to describe goods or services similar or competitive to those offered by [Applicant]."

---

[43] Cason Testimony Decl. ¶13 (28 TTABVUE 4); Dobson Testimony Decl. ¶13 (28 TTABVUE 6); Guess Testimony Decl. ¶13 (28 TTABVUE 8); Kittleson Testimony Decl. ¶13 (28 TTABVUE 10); Koltes Testimony Decl. ¶11 (28 TTABVUE 12); Lowe Testimony Decl. ¶13 (28 TTABVUE 14); McDougal Testimony Decl. ¶13 (28 TTABVUE 16); Robinson Testimony Decl. ¶13 (28 TTABVUE 18); Shrout Testimony Decl. ¶13 (28 TTABVUE 20).

Applicant introduced an article posted on the Hot Rod Network website (hotrod.com) that uses NATIONAL MIDGET SERIES in the following manner.

> Midget Racing – The Many Faces of [Applicant]
>
> (August 13, 2007)
>
> As far back as the mid-'50s, [Applicant] sanctioned the National Midget Series and the Sprint Car Series. In fact, they have crowned a champion in each of those series since 1956.[44]

Determining whether a term is generic is fact intensive and depends on the record. *See In re Tennis Indus. Ass'n,* 102 USPQ2d 1671, 1680 (TTAB 2012); *see also Royal Crown,* 127 USPQ2d at 1044 ("Whether an asserted mark is generic or descriptive is a question of fact" based on the entire evidentiary record). As noted above, we must give due consideration to the evidence of consumer perception of the use of the mark as a whole. *Princeton Vanguard,* 114 USPQ2d at 1831 (quoting *In re Steelbuilding.com,* 415 F.3d 1293, 75 USPQ2d 1420, 1421 (Fed. Cir. 2005) ("An inquiry into the public's understanding of a mark requires consideration of the mark as a whole. Even if each of the constituent words in a combination mark is generic, the combination is not generic unless the entire formulation does not add any meaning to the otherwise generic mark.")).

The evidence fails to establish that NATIONAL MIDGET SERIES is used or understood by the relevant purchasing public as referring to a class of "entertainment services, namely, arranging and conducting automobile racing events; and sanctioning, supervising, and officiating of automobile races." In this case, Opposer's

---

[44] Miller Testimony Decl. Exhibit B (22 TTABVUE 33).

witness testimony names only Opposer as another entity in the industry that uses this phrase, and that use is in conjunction with Applicant. Opposer's witness testimony as to consumer perception is simply conclusory without basis. This unconvincing testimony is further undermined by Applicant's witnesses who testify the phrase is not used by others. Finally, the use of NATIONAL MIDGET SERIES introduced by Opposer is inconclusive as it could be perceived as trademark use and not as the name of the genus. *See Alcatraz Media, Inc. v. Chesapeake Marine Tours, Inc.*, 107 USPQ2d 1750, 1763 (TTAB 2013), *aff'd*, 565 F. App'x 900 (Fed. Cir. 2014) (mem.) ("use of the phrase both generically and as part of what appear to be trademarks or trade names … fails to establish that the primary significance of ANNAPOLIS TOURS to the relevant public is guided tour services of cities, rather than a guided tour service of cities provided by a particular entity.").

Opposer has failed to meet its burden of showing by a preponderance of the evidence that the relevant public uses or understands NATIONAL MIDGET SERIES to be generic for "entertainment services, namely, arranging and conducting automobile racing events; and sanctioning, supervising, and officiating of automobile races." We find that, on **this** record, Opposer has not proved that "members of the relevant public primarily use or understand the term … to refer to the genus of goods or services in question," including the subcategory of automobile races for midget racing cars. *Royal Crown*, 127 USPQ2d at 1046 (quoting *Marvin Ginn*, 228 USPQ at 530).

The opposition is dismissed on the ground that NATIONAL MIDGET SERIES is a generic term.

## V. Whether NATIONAL MIDGET SERIES has acquired distinctiveness?

We begin our analysis of whether NATIONAL MIDGET SERIES has acquired distinctiveness by noting that because Applicant seeks registration under Section 2(f) of the Trademark Act, Applicant has conceded that NATIONAL MIDGET SERIES is merely descriptive. *Royal Crown*, 127 USPQ2d at 1044-45. Applicant has the ultimate burden of proving acquired distinctiveness when registration is sought under Section 2(f). *See Real Foods Pty Ltd. v. Frito-Lay N. Am., Inc.,* 128 USPQ2d at 1374 (applicant has the final burden of going forward with evidence proving acquired distinctiveness); *Yamaha Int'l Corp. v. Hoshino Gakki Co., Ltd.,* 840 F.2d 1572, 6 USPQ2d 1001, 1006 (Fed. Cir. 1988). The greater the degree of descriptiveness, the greater the evidentiary burden on the user to establish acquired distinctiveness. *See Real Foods Pty Ltd. v. Frito-Lay N. Am., Inc.,* 128 USPQ2d at 1373 ("[T]he applicant's burden of showing acquired distinctiveness increases with the level of descriptiveness; a more descriptive term requires more evidence of secondary meaning."); *Royal Crown*, 127 USPQ2d at 1045 ("Where a mark sits on a sliding scale of descriptiveness impacts the burden a proposed registrant must bear with respect to its claim of acquired distinctiveness."); *Yamaha Int'l. Corp.,* 6 USPQ2d at 1008*; Merrill Lynch, Pierce, Fenner & Smith,* 4 USPQ2d at 1144. The sufficiency of the evidence offered to prove acquired distinctiveness must be evaluated in light of the nature of the designation. Highly descriptive terms are less likely to be perceived as trademarks, and therefore

more substantial evidence of secondary meaning will ordinarily be required to establish their distinctiveness. "In assessing acquired distinctiveness, accordingly, the Board must first determine whether the proposed mark is highly descriptive rather than merely descriptive." *Royal Crown*, 127 USPQ2d at 1045.

In this case, we find that NATIONAL MIDGET SERIES is highly descriptive. As noted in the preceding section analyzing whether NATIONAL MIDGET SERIES is a generic term, each word in the mark retains its descriptive or generic significance in the mark as a whole. When the individual words are combined and used in connection with automobile racing, the mark as a whole means a number of related nationwide midget automobile races. Thus, the mark as a whole is even more descriptive of Applicant's identified services than its individual components standing alone. This finding of fact is corroborated by the use of the term NATIONAL MIDGET SERIES introduced by both parties.

Because we have found that the term NATIONAL MIDGET SERIES is highly descriptive of Applicant's services, Applicant's burden of establishing acquired distinctiveness under Section 2(f) is commensurately high. *See Steelbuilding.com*, 75 USPQ2d at 1424; *In re Bongrain Int'l Corp.*, 894 F.2d 1316, 13 USPQ2d 1727, 1729 (Fed. Cir. 1990); *In re LC Trademarks, Inc.,* 121 USPQ2d 1197, 1199 (TTAB 2016).[45]

"To show that a mark has acquired distinctiveness, an applicant must demonstrate that the relevant public understands the primary significance of the

---

[45] But even if NATIONAL MIDGET SERIES were closer to the suggestive side of the descriptiveness spectrum, and not highly descriptive, our decision would be the same.

mark as identifying the source of a product or service rather than the product or service itself." *Steelbuilding.com*, 75 USPQ2d at 1422; *see also Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1729 (Fed. Cir. 2012). Our ultimate Section 2(f) analysis and determination in this case is based on all of the evidence considered as a whole.

> [T]he considerations to be assessed in determining whether a mark has acquired secondary meaning can be described by the following six factors: (1) association of the [mark] with a particular source by actual purchasers (typically measured by customer surveys); (2) length, degree, and exclusivity of use; (3) amount and manner of advertising; (4) amount of sales and number of customers; (5) intentional copying; and (6) unsolicited media coverage of the product embodying the mark.

*In re Snowizard, Inc.*, 129 USPQ2d 1001, 1105 (TTAB 2018) (quoting *Converse, Inc. v. Int'l Trade Comm'n*, 907 F.3d 1361, 128 USPQ2d 1538, 1546 (Fed. Cir. 2018)); *see also Steelbuilding.com*, 75 USPQ2d at 1424; *Cicena Ltd. v. Columbia Telecomms. Grp.*, 900 F.2d 1546, 14 USPQ2d 1401, 1406 (Fed. Cir. 1990). On this list, no single factor is determinative. *In re Tires, Tires, Tires Inc.*, 94 USPQ2d 1153, 1157 (TTAB 2009); *see also In re Ennco Display Sys. Inc.*, 56 USPQ2d 1279, 1283 (TTAB 2000) ("Direct evidence [of acquired distinctiveness] includes actual testimony, declarations or surveys of consumers as to their state of mind. Circumstantial evidence, on the other hand, is evidence from which consumer association might be inferred, such as years of use, extensive amount of sales and advertising, and any similar evidence showing wide exposure of the mark to consumers.").

Applicant relies on the following evidence to prove that NATIONAL MIDGET SERIES has acquired distinctiveness:[46]

- Since 1956, Applicant has been using NATIONAL MIDGET SERIES for sanctioning, organizing and conducting automobile races;[47]

- Since 1956, Applicant "has sanctioned nearly 2,500 midget car events in nearly every state under the trademarks NATIONAL MIDGET SERIES and NATIONAL MIDGET CHAMPIONSHIP";[48]

- In 2017, Applicant sanctioned 24 NATIONAL MIDGET SERIES events;[49]

- Applicant sanctions more midget races than any other sanctioning body in the United States;[50]

- Applicant has been recognized by major sports publications;[51]

- NATIONAL MIDGET SERIES races and other sanctioned races are broadcast throughout the United States by Applicant's on-demand service Loudpedal.tv which has "approximately 700 active subscribers and averages 15,000 views per month";[52]

---

[46] The parties' dueling declarations have equal probative value and do not tip the analysis in favor of either party.

[47] Miller Testimony Decl. ¶8 (22 TTABVUE 3).

[48] *Id.* at ¶10 (22 TTABVUE 3).

[49] *Id.* at ¶19 (22 TTABVUE 5).

[50] *Id.* at ¶20 (22 TTABVUE 5).

[51] *Id.* at ¶12 and Exhibit B (22 TTABVUE 4 and 31-72).

[52] *Id.* at ¶15 (22 TTABVUE 4-5).

- Select NATIONAL MIDGET SERIES races are broadcast live by Speed Shift TV;[53]

- "In 2017, Applicant's Facebook videos logged over 2,200,000 views.";[54]

- Famous drivers with significant fan bases have competed in NATIONAL MIDGET SERIES events;[55]

- In the past ten years, many fans have attended NATIONAL MIDGET SERIES events;[56]

- Applicant promotes its NATIONAL MIDGET SERIES events by entering into strategic partnerships with others including Oakley, Toyota, and AMSOIL;[57]

- Since 2010, Applicant has promoted its NATIONAL MIDGET SERIES and NATIONAL MIDGET CHAMPIONSHIP events;[58] and

- Applicant promotes its NATIONAL MIDGET SERIES and NATIONAL MIDGET CHAMPIONSHIP events on its Facebook page that has 105,000

---

[53] *Id.*

[54] *Id.* at ¶16 (22 TTABVUE 5).

[55] *Id.* at ¶21 (22 TTABVUE 5).

[56] *Id.* at ¶22 (23 TTABVUE 5). Applicant designated the fan attendance figures confidential so we refer to them in general terms. Mr. Miller testified that he believes attendance is high compared to other midget race series in the United States. *Id.*

[57] *Id.* at ¶24 (22 TTABVUE 6).

[58] *Id.* at ¶26 (23 TTABVUE 6). Applicant designated its advertising expenditures confidential, so we refer to them in general terms. Mr. Miller testified that its advertising figures do not include advertising by the host race tracks and that he believes Applicant's advertising is high compared to other midget racing sanctioning bodies. *Id.*

"likes" and through its Twitter account which has more than 35,000 followers.[59]

Based on our review of the evidence in its entirety, we find that Applicant failed to prove that its use of NATIONAL MIDGET SERIES has acquired distinctiveness. First, Applicant's 60-plus years of use of NATIONAL MIDGET SERIES, while indicative of its longevity, is not dispositive that Applicant's use of NATIONAL MIDGET SERIES has acquired distinctiveness. *See Ennco Display Sys.,* 56 USPQ2d at 1286 (applicant's use of the product designs ranging from seven to seventeen years is insufficient to bestow acquired distinctiveness); *In re Packaging Specialists, Inc.,* 221 USPQ 917, 920 (TTAB 1984) (evidence submitted by applicant held insufficient to establish acquired distinctiveness of PACKAGING SPECIALISTS, INC., for contract packaging services, notwithstanding, inter alia, continuous and substantially exclusive use for sixteen years, deemed "a substantial period but not necessarily conclusive or persuasive"). Applicant's long use of NATIONAL MIDGET SERIES is a factor that we consider in connection with the other evidence.

Second, Opposer has demonstrated that it has sanctioned NATIONAL MIDGET SERIES events since 2004.[60] Further, as discussed above, Kenneth Brown testified that Opposer and Lucas Oil Products have co-sanctioned NATIONAL MIDGET SERIES events with Applicant.[61] Applicant did not challenge Mr. Brown's testimony

---

[59] *Id.* at ¶29 (22 TTABVUE 7).

[60] Brown Testimony Dep., p. 32 (33 TTABVUE 35); third party testimony declarations at paragraph No. 7 (28 TTABVUE).

[61] Brown Testimony Dep., pp. 14-16 and Exhibit 9 (33 TTABVUE 17-19 and 85-87).

on cross examination, nor did Applicant dispute Mr. Brown's testimony in Kevin Miller's testimony declaration.[62] This testimony and evidence combined with the third party witnesses who testified that they are aware that Opposer "has used the phrase NATIONAL MIDGET SERIES for its arranging and conducting of automobile racing events and sanctioning, supervising, and officiating of automobile races across the country since as early as 2004" is probative that Applicant's use of NATIONAL MIDGET SERIES has not been substantially exclusive. *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 222 USPQ 939, 940-41 (Fed. Cir. 1984) ("When the record shows that purchasers are confronted with more than one (let alone numerous) independent users of a term or device, an application for registration under Section 2(f) cannot be successful, for distinctiveness on which purchasers may rely is lacking under such circumstances."); *Quaker State Oil Refining Corp. v. Quaker Oil Corp.*, 453 F.2d 1296, 172 USPQ 361, 363 (CCPA 1972) (evidence insufficient to establish distinctiveness due to significant and continuous concurrent use of term by competitor such that applicant's use was not substantially exclusive).

---

[62] In its Brief, Applicant concedes that it has co-sanctioned events with Opposer in which Applicant allowed Opposer to use NATIONAL MIDGET SERIES under Applicant's control. Applicant's Brief, p. 12 (38 TTABVUE 17). However, this is attorney argument unsupported by any testimony or evidence and, therefore, it does not have any probative value. *Zheng Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1799 (Fed. Cir. 2018) (quoting *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 424 F.3d 1276, 76 USPQ2d 1616, 1622 (Fed. Cir. 2005) ("Attorney argument is no substitute for evidence.")); *Martahus v. Video Duplication Servs. Inc.*, 424 F.3d 417, 27 USPQ2d 1846, 1849 (Fed. Cir. 1993) ("mere attorney arguments unsubstantiated by record evidence are suspect at best"); *In re Simulations Pub'ns, Inc.*, 521 F.2d 797, 187 USPQ 147, 148 (CCPA 1975) (where appellant argued that the magazines at issue deal with unrelated subject matter, the court held that "[s]tatements in a brief cannot take the place of evidence.").

Third, although Mr. Miller testified that Applicant has sanctioned nearly 2,500 midget car events under NATIONAL MIDGET SERIES and NATIONAL MIDGET CHAMPIONSHIP, he did not specify how many were NATIONAL MIDGET SERIES sanctioned events. Nearly 2,500 events over the past 62 years is an average of 40 events per year. Mr. Miller testified that in 2017, Applicant sanctioned 24 NATIONAL MIDGET SERIES events. There is no testimony or evidence as to how many events were NATIONAL MIDGET SERIES events prior to 2017. Thus, it is clear that not all of the 2,500 events were NATIONAL MIDGET SERIES events, and it remains unclear how many of the events were.

Fourth, the record is ambiguous on how many fans attended Applicant's NATIONAL MIDGET SERIES events. Mr. Miller testified that "In the last 10 years, the average total number of fans who attended NATIONAL MIDGET SERIES races was [X]."[63] We do not know if the confidential attendance figure is supposed to be the average yearly total attendance or the average attendance per race. Particularly because Applicant provided Mr. Miller's testimony through a declaration, by which the declarant has the opportunity to carefully consider and draft his testimony, there is no excuse for any ambiguity.

Fifth, even though Mr. Miller testified that he believes Applicant's advertising expenditures since 2010 are high compared with other midget racing sanctioning bodies, Applicant's advertising expenditures since 2010 have been de minimis.

---

[63] Miller Testimony Decl. ¶22 (23 TTABVUE 5). The number of fans was designated confidential.

Moreover, other than social media, there was no testimony or evidence regarding how Applicant advertises its NATIONAL MIDGET SERIES events.

With respect to the social media advertising, Applicant provided no explanation or context as to the meaning of Applicant's 105,000 Facebook "likes" and 35,000 Twitter followers. Presented in a vacuum as in this case, it is not clear what 105,000 Facebook "likes" or 35,000 Twitter followers mean. If Applicant is going to submit testimony/evidence about the pervasiveness of its social media, then Applicant should provide an explanation about how it is probative. For example, are the 105,000 Facebook "likes" from 105,000 separate individuals or does it include multiple "likes" from the same individuals; 105,000 Facebook "likes" constitutes what percentage of Applicant's fan base; how many of the "likes" are from people in the United States and how many are from people outside of the United States; how many of the Facebook "likes" are in response to a NATIONAL MIDGET SERIES posting? Also, it is likely that there is some overlap between the 105,000 Facebook "likes" and the 35,000 Twitter followers.

Sixth, Mr. Miller testified that Applicant "has a long history of being one of the most recognized institutions in the world of auto racing," and introduced Exhibit B to support his testimony.[64] However, only one of the articles refers to NATIONAL MIDGET SERIES:

> Hot Rod Network website (hotrod.com).
>
> Midget Racing – The Many Faces of [Applicant]

---

[64] Miller Testimony Decl. ¶12 and Exhibit B (22 TTABVUE 4 and 31-72).

> (August 13, 2007)
>
> As far back as the mid-'50s, [Applicant] sanctioned the National Midget Series and the Sprint Car Series. In fact, they have crowned a champion in each of those series since 1956.[65]

Accordingly, the record lacks a persuasive showing of media recognition regarding Applicant's use of NATIONAL MIDGET SERIES and how that term points uniquely and exclusively to Applicant.

Finally, Applicant's on-demand service Loudpedal.tv has "approximately 700 active subscribers and averages 15,000 views per month." Presumably, this is enough to keep the on-demand service broadcasting. However, 700 active subscribers represents a relatively small number of viewers who apparently average in excess of 21 views per month.[66] Moreover, Applicant did not provide any testimony or evidence as to how many NATIONAL MIDGET SERIES events are broadcast every month. Likewise, with respect to Mr. Miller's testimony that select NATIONAL MIDGET SERIES events are broadcast live by Speed Shift TV, Applicant did not provide any testimony or evidence as to how many events have been broadcast or how many people viewed them.

When we weigh all of the testimony and evidence and consider it in its entirety, Applicant has failed to meet its burden of proving that automobile racing fans, racetrack promoters, racetrack owners, professional racecar drivers, midget car

---

[65] Miller Testimony Decl. Exhibit B (22 TTABVUE 33).

[66] If 700 active subscribers is not a small number, Applicant did not provide any testimony or evidence to explain the context or significance of 700 active subscribers.

builders and owners, and automobile racing associations understand the primary significance of the term NATIONAL MIDGET SERIES as identifying Applicant's services and, therefore, NATIONAL MIDGET SERIES used in connection with Applicant's services has not acquired distinctiveness.

## VI.    Applicant's Affirmative Defense.

Applicant argues that Opposer cannot be damaged by the registration of NATIONAL MIDGET SERIES in connection with "entertainment services, namely, arranging and conducting automobile racing events; and sanctioning, supervising, and officiating of automobile races" because it owns Registration No. 3753495 for the mark NATIONAL MIDGET CHAMPIONSHIP for the same services. To support its premise, Applicant cites *Morehouse Mfg. Corp. v. J. Strickland & Co.*, 160 USPQ 715, and *TBC Corp. v. Grand Prix, Ltd.*, 12 USPQ2d 1311, 1313 (TTAB 1989) (the prior registration defense is an equitable defense similar to that of laches or acquiescence).

However, registration of a mark under the provisions of Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f), is an exception to the prohibition against registering a mark that is merely descriptive. *Real Foods Pty Ltd. v. Frito-Lay N. Am., Inc.,* 128 USPQ2d at 1374 (quoting *Yamaha Int'l Corp.,* 6 USPQ2d at 1007). Because "[t]he prior registration or *Morehouse* defense is an equitable defense …," *O-Bread, Inc. v. U.S. Olympic Comm.*, 65 F.3d 933, 36 USPQ2d 1041, 1045 (Fed. Cir. 1995)), it is unavailable against a claim that a mark is merely descriptive. *See Couch/Braunsdorf Affinity, Inc. v. 12 Interactive, LLC,* 110 USPQ2d 1458, 1472 (TTAB 2014); *TBC Corp. v. Grand Prix Ltd.*, 12 USPQ2d at 1313. The reason for this

policy making equitable defenses unavailable for descriptiveness claims was explained by the Board in *Southwire Co. v. Kaiser Aluminum & Chem. Corp.*, 196 USPQ 566, 573 (TTAB 1977) as follows:

> The theory underlying this principle * * * is that it is within the public interest to preclude registration of merely descriptive designations, to cancel registrations which are void ab initio because of this disability of the registered mark as of the time the application was filed, and to cancel those registrations where the registered marks have, since the time of registration, become terms of art or common description; and that this interest or concern cannot be waived by the inaction of any single person or concern, no matter how long the delay persists.

The prior registration defense, an equitable defense specific to one party and analogous to laches or acquiescence, is unavailable in an inter partes proceeding predicated on whether a merely descriptive mark has acquired distinctiveness because of the overriding public interest in precluding the registration of a merely descriptive designation.

The prior registration or *Morehouse* defense does not apply when the issue is whether a merely descriptive mark has acquired distinctiveness.[67]

**Decision:** The opposition is dismissed on the ground that Applicant's purported mark is generic.

---

[67] Moreover, the *Morehouse* defense does not apply when the mark sought to be registered is not essentially the same as the previously registered mark. Here, NATIONAL MIDGET SERIES and NATIONAL MIDGET CHAMPIONSHIP are materially different marks. *See O-Bread, Inc. v. U.S. Olympic Comm.,* 36 USPQ2d at 1045 ("OLYMPIC and OLYMPIC KIDS are neither the same mark nor are they legal equivalents.").

The opposition is sustained on the ground that Applicant's purported mark NATIONAL MIDGET SERIES is merely descriptive and has not acquired distinctiveness.