THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: December 3, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*In re Dimarzio, Inc.*
_____

Serial No. 87213400
_____

Ronald S. Bienstock of Scarinci Hollenbeck LLC,
    for Dimarzio, Inc.

Tasneem Hussain,[1] Trademark Examining Attorney, Law Office 118,
    Michael Baird, Managing Attorney.

_____

Before Lynch, Larkin and Lebow,
    Administrative Trademark Judges.

Opinion by Lebow, Administrative Trademark Judge:

Applicant, Dimarzio, Inc., appeals the Trademark Examining Attorney's final

refusal, under Trademark Act Sections 1, 2, and 45, 15 U.S.C. §§ 1051-1052, and

1127, to register the color cream as a mark on the Principal Register for "electronic

sound pickup[s] for guitars," in International Class 9, on the ground that the proposed

---

[1] The application was assigned to several USPTO trademark examining attorneys over the course of prosecution. Ms. Hussain, the third, filed the brief in this case. References in our decision to the "Examining Attorney" are to the assigned examining attorney at the relevant time.

color mark is not distinctive.[2] In particular, Applicant challenges the Examining Attorney's finding that Applicant's evidence of acquired distinctiveness under Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f), is insufficient to demonstrate that the proposed color mark has become distinctive of Applicant's goods in commerce.

Applicant's second amended drawing is shown below, with "[t]he broken lines depicting the overall shapes" of Applicant's electronic sound pickup[s] for guitars, and "indicating placement of the [proposed] mark on the goods and are not part of the mark." The mark is described as consisting of "the distinctive color cream applied to the entire surface of the goods, which are a three-dimensional configuration of an electronic sound pickup for guitars featuring a double coil design. The broken lines depicting the overall shapes of the pickup, indicating placement of the mark on the goods and are not part of the mark." The color cream is claimed as a feature of the mark:[3]

---

[2] Application Serial No. 87213400 was filed on October 24, 2016 under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), based on Applicant's claim of first use of the mark anywhere, and in commerce, at least as early as February 1979.

Citations in this opinion to the briefs and other docket entries on appeal refer to TTABVUE, the Board's online docketing system. *Turdin v. Tribolite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014). Specifically, the number preceding TTABVUE corresponds to the docket entry number, and any numbers following TTABVUE refer to the page number(s) of the docket entry where the cited materials appear. Page references to the trademark registration record in this proceeding refer to the online database of the USPTO's Trademark Status & Document Retrieval ("TSDR") system. All citations to documents contained in the TSDR database are to the downloadable .pdf versions of the documents in the USPTO TSDR Case Viewer.

[3] March 12, 2019 Response to Office Action, TSDR 1.



<sup></sup>[4]

For the reasons explained, we affirm the refusal to register.

## I. Examining Attorney's Objections

The Examining Attorney lodges a number of objections, including an objection to the format of Applicant's main brief on appeal, explaining that "Applicant's brief, excluding cover page and attachments, consist (sic) of 16 pages of single-spaced text."[5] Citing Trademark Rule 2.126(a)(1), 37 C.F.R. § 2.126(a)(1) and TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 1203.01, she maintains that "all submissions to the Trademark Trial and Appeal Board must be double spaced."[6]

The Examining Attorney also objects to the length of the brief, arguing that Applicant's 16-page single-spaced brief exceeds the applicable page limits when accounting for Applicant's improper spacing.[7] *See* Trademark Rule 2.142(b)(2), 37 C.F.R. § 2.142(b) ("[w]ithout prior leave of the Trademark Trial and Appeal Board, a brief shall not exceed twenty-five pages in length in its entirety, including the table of contents, index of cases, description of the record, statement of the issues,

---

[4] "The shade described as "cream" appears quite dark in the drawing.

[5] 12 TTABVUE 4 (Examining Attorney's Brief).

[6] *Id.*

[7] *Id.* at 5.

recitation of the facts, argument, and summary."). She explains her calculations as follows:

> [T]he body of the brief contains 8,416 words. Assuming that an average page of double-spaced, 12-point text contains 250 words, it appears that if properly formatted, applicant's brief would extend to nearly 34 pages. Even if the font size were reduced to 11 points, the total number of pages would still be well over the 25 page limit set by the Rule. There is no indication that applicant either sought or received leave of the Board to disregard this guideline.[8]

Finally, noting that "[t]he record in an application should be complete prior to the filing of an appeal," *see* Trademark Rule 2.142(c), 37 C.F.R. § 2.142(d), the Examining Attorney objects to new evidence submitted by Applicant with its main brief, in particular, "a May 2021 article about applicant's trademark,"[9] and "requests that the Board disregard it."[10]

---

[8] *Id* (citations omitted). To obtain the number of words, the Examining Attorney "converted the body of applicant's brief as a Microsoft Word document, and then selected the 'Word Count' feature available in the 'Review' menu." *Id.* at note 2. She also provides a link to an online article, *id.* at note 3, she asserts explains the "rule of thumb" that "an average page of double-spaced, 12-point text contains 250 words." "[W]e do not consider websites for which only links are provided." *In re Aquitaine Wine USA, LLC*, 126 USPQ2d 1181, 1195 n.21 (TTAB 2018). However, multiple courts have found that an average page of text contains 250 words. *See U. S. v. Sellers*, 645 F.3d 830, 839 n. 4 (7th Cir. 2011) ("It was clear that he was not prepared to give an opening statement that day, as it was less than one page of transcript (250 words)…."); *Corbello v. DeVito*, 262 F. Supp. 3d 1056, 1075 (D. Nev. 2017) ("Those 145 words constitute about 0.2% of the approximately 68,500 words in the Work (approximately 250 words per page times 274 pages)"); *Harpercollins Publ., L.L.C. v. Arnell*, 886 N.Y.S.2d 71, n. 1 (Sup. Ct. N.Y. Co. 2009) ("It is undisputed that the standard in the book publishing industry is that a full text page contains 250 words."); *Commonwealth v. Spuck*, 86 A.3d 870, 873 (Pa. Super. 2014) ("Although we have opted not to count every word contained in Mr. Spuck's brief (for reasons that are self-evident), based upon a conservative estimate of 250 words per page, and factoring in the significant number of single-spaced pages in the brief, we are confident that Mr. Spuck's brief substantially exceeds 21,000 words, half again the number of words he is permitted….").

[9] Applicant submitted more new evidence with its appeal brief than just the referenced article.

[10] *Id.* at 4.

Applicant does not deny that its main brief exceeds the applicable page limits, addressing the Examining Attorney's "purported objections" in its reply brief to "state[] only that the brief was dual functioning as Applicant's appeal and Applicant's response to the March 27, 2019 'Final Office Action' upon the reinstitution of this matter. Further, it is the priority of the Trademark Trial and Appeal Board to make determinations on the merits. Therefore, the brief requirements should be relaxed and Applicant's brief should be permitted."[11]

The Examining Attorney's objections are well-taken. The applicable Trademark Rules are clear: (1) "Without prior leave of the … Board, a brief shall not exceed twenty-five pages in length in its entirety," Rule 2.142(d), and (2) submissions to the Board "must be double-spaced," Rule 2.126(a) and (b), 37 C.F.R § 2.126 (a) and (b). Applicant's brief would undoubtedly exceed 25 pages if Applicant used double-spaced text, as required. The Examining Attorney's objection to the form and length of Applicant's appeal brief is thus **sustained**, and we do not consider it.[12] In light of this ruling, we need not address the Examining Attorney's further objection to the submission of new evidence with Applicant's brief. [13]

---

[11] 13 TTABVUE 2 (Applicant's Reply Brief).

[12] With regard to Applicant's argument that the brief also functioned as a response to the last Office action of March 27, 2019, there is no provision for such a filing in an ex parte appeal. Moreover, in its earlier request to suspend Board proceedings, Applicant did not specify the request should also cover any time remaining to respond to an Office action. And indeed, the Board order resuming proceedings clearly set a deadline to file a brief without mention of any time to respond to an Office Action. Under these circumstances, we do not exercise our discretion to consider the brief.

[13] Unlike Applicant's appeal brief, Applicant's reply brief is double-spaced and does not exceed ten pages, as required by Rule 2.142(b)(2). Therefore, to the extent that Applicant's argument therein constitutes rebuttal, we consider it.

## II.    Applicable Law

As a matter of law, marks consisting of a single color on a product's design are not inherently distinctive and can only be registered upon a showing of acquired distinctiveness (or secondary meaning). *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 54 USPQ2d 1065, 1068 (2000) (citing *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 34 USPQ2d 1161, 1162-63 (1995)). *See also In re Thrifty, Inc.*, 274 F.3d 1349, 61 USPQ2d 1121, 1124 (Fed. Cir. 2001). *Cf. In re Forney Indus., Inc.*, 955 F.3d 940, 2020 USPQ2d 10310, at *3 (Fed. Cir. 2020) (Multi-color "marks can be inherently distinctive when used on product packaging, depending upon the character of the color design.").[14] To make this showing, Applicant must demonstrate that the relevant members of the public—here, consumers of guitar pickups—understand the primary significance of the color cream as identifying the source of Applicant's goods rather than merely ornamenting them. *See Milwaukee Elec. Tool Corp. v. Freud Am., Inc.*, 2019 USPQ2d 460354, at *19 (TTAB 2019) (in a case of an alleged color mark on a product, the question is whether the "primary significance of the … mark to the relevant public … is as a source-indicator" or simply as "ornamentation") (citing, *inter alia*, *Wal-Mart v. Samara*, 54 USPQ2d at 1069), *civil*

---

[14] As the Federal Circuit has observed, "color is usually perceived as ornamentation. While ornamentation is not incompatible with trademark function, 'unless the design is of such nature that its distinctiveness is obvious, convincing evidence must be forthcoming to prove that in fact the purchasing public does recognize the design as a trademark which identifies the source of the goods.'" *In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 227 USPQ 417, 422 (Fed. Cir. 1985) (quoting *In re David Crystal, Inc.*, 296 F.2d 771, 132 USPQ 1, 2 (CCPA 1961)). Unlike some designs, single colors and product configurations are never inherently distinctive. *See Wal-Mart v. Samara,* 54 USPQ2d at 1068 (citations omitted) (color not inherently distinctive; *In re Change Wind Corp.*, 123 USPQ2d 1453, 1467 (TTAB 2017) (citing *Wal-Mart v. Samara, Id.* (product configurations not inherently distinctive).

*action filed*, No. 1:20-cv-00902-RGA (D. Del. Feb. 3, 2020); *Edward Weck Inc. v. IM Inc.*, 17 USPQ2d 1142, 1145 (TTAB 1990) (same); *see generally In re Steelbuilding.com*, 415 F.3d 1293, 75 USPQ2d 1420, 1422 (Fed. Cir. 2005) ("To show that a mark has acquired distinctiveness, an applicant must demonstrate that the relevant public understands the primary significance of the mark as identifying the source of a product or service rather than the product or service itself.").

As explained by the Federal Circuit, "the considerations to be assessed in determining whether a mark has acquired secondary meaning can be described by the following six factors: (1) association of the trade dress with a particular source by actual purchasers (typically measured by customer surveys); (2) length, degree, and exclusivity of use; (3) amount and manner of advertising; (4) amount of sales and number of customers; (5) intentional copying; and (6) unsolicited media coverage of the product embodying the mark. *Converse, Inc. v. Int'l Trade Comm'n*, 909 F.3d 1110, 128 USPQ2d 1538, 1546 (Fed. Cir. 2018); *In re SnoWizard*, 129 USPQ2d 1001, 1005 (TTAB 2018).[15] No single factor is determinative and "[a]ll six factors are to be weighed together in determining the existence of secondary meaning." *In re Guaranteed Rate, Inc.*, 2020 USPQ2d 10869, at *3 (TTAB 2020) (quoting *Converse*,

---

[15] The *Converse* factors dovetail with Trademark Rule 2.41(a)(3), 37 CFR § 2.41(a)(3), which provides that "[i]n appropriate cases, where the applicant claims that a mark has become distinctive in commerce of the applicant's goods or services, the applicant may, in support of registrability, submit with the application, or in response to a request for evidence or to a refusal to register, verified statements, depositions, or other appropriate evidence showing duration, extent, and nature of the use in commerce and advertising expenditures in connection therewith (identifying types of media and attaching typical advertisements), and verified statements, letters or statements from the trade or public, or both, or other appropriate evidence of distinctiveness."

128 USPQ2d at 1546).

Acquired distinctiveness may be shown by direct evidence (i.e., "actual testimony, declarations or surveys of consumers as to their state of mind") or indirect evidence from which consumer association may be inferred (i.e., "years of use, extensive amounts of sales and advertising, and any similar evidence showing wide exposure of the mark to consumers"). *In re OEP Enters. Inc.*, 2019 USPQ2d 309323, at *50 (TTAB 2019) (quoting *Stuart Spector Designs Ltd. v. Fender Musical Instruments Corp.*, 94 USPQ2d 1549, 1554 (TTAB 2009)); *see also Schlafly v. Saint Louis Brewery*, LLC, 909 F.3d 420, 128 USPQ2d 1739, 1743 (Fed. Cir. 2018) ("The Board and courts have recognized that both direct and circumstantial evidence may show secondary meaning") (internal citation omitted). When the evidence comprises indirect evidence such as the applicant's length and manner of use, it is usually expected that such indirect evidence will be "supplemented by evidence of the effectiveness of such use to cause the purchasing public to identify the mark with the source of the product." *Owens-Corning*, 227 USPQ at 422.

Finally, the burden of proving a prima facie case of acquired distinctiveness in an ex parte proceeding rests with the applicant. *See Yamaha Int'l Corp. v. Hoshino Gakki Co. Ltd.*, 840 F.2d 1572, 6 USPQ2d 1001, 1004 (Fed. Cir. 1988). While there is no fixed rule for the amount of proof necessary to demonstrate acquired distinctiveness, "[t]he burden of proving that a color mark has acquired distinctiveness is substantial." *Milwaukee Elec. Tool Corp.*, 2019 USPQ2d 460354, at *23 (citing *Owens-Corning*, 227 USPQ at 424 ("By their nature color marks carry a

difficult burden in demonstrating distinctiveness and trademark character.")).

## III. Evidence and Analysis

During prosecution, Applicant agreed that "a color mark is only registrable on the Principal Register upon a sufficient showing of acquired distinctiveness," and that "[t]he burden of proving that a color mark has acquired distinctiveness is substantial."[16] Therefore, we focus on whether Applicant has met this burden.

### A. Evidence that Consumers Associate the Color Cream with Applicant, and Intentional Copying

As noted, the consumer association factor is "typically measured by consumer surveys." *Converse*, 128 USPQ2d at 1546. Applicant does not offer a survey, but does offer nine fill-in-the-blank dealer declarations (including three dealers who each submitted two declarations) and five fill-in-the-blank "customer" declarations (including three of the dealers from the other declarations, but who in these declarations are customers).[17] Thus, eight different declarants submitted declarations.

However, the declarations have little, if any, probative value. Even putting aside their small number, conclusory nature, and lack of identifying information,[18] the

---

[16] *See e.g.,* Applicant's March 12, 2019 Response to Office Action, TSDR 19.

[17] November 6, 2017 Response to Office Action, TSDR 132-51; March 12, 2019 Response to Office Action, TSDR 32-43.

[18] *Cf. In re UDOR U.S.A., Inc.*, 89 USPQ2d 1978, 1987 (TTAB 2009) ("Focusing on the stated opinions of the distributors and retailers of spray nozzles, the underlying factual basis for their conclusory statements is not apparent. Given this weakness, the declarations do not suffice to prove that applicant's design has acquired distinctiveness as a source-indicator."); *In re Lorillard Licensing Co.*, 99 USPQ2d 1312, 1319 (TTAB 2011) (criticizing consumer

declarations suffer from a more glaring defect: none of them relates to the proposed color mark at issue in this appeal. In addition, the declarants identify the proposed mark as follows:



or



[19]

However, the proposed mark is the "color cream applied to the entire surface of the goods, which are a three-dimensional configuration of an electronic sound pickup for guitars featuring a double coil design. The broken lines depicting the overall shapes of the pickup, indicating placement of the mark on the goods and are not part of the mark." Thus, the declarants' statements that a claimed product configuration

---

declarations because there was no indication whether the declarants were all from the same city or whether they were geographically diverse).

[19] November 6, 2017 Response to Office Action, TSDR 132-51; March 12, 2019 Response to Office Action, TSDR 32-43.

mark "has always been a unique and distinctive feature of the [Applicant] Goods"; "instantly identifies a guitar as [a]n [Applicant] Good"; "is a distinctive, memorable feature due to the long, substantially exclusive use … by [Applicant] and the popularity of the [Applicant] Goods"; "identifies for me only the pickups of [Applicant] and distinguishes them from others"; and "would be recogniz[ed] … as one by [Applicant]" even without seeing [Applicant's] brand logo on the guitar or the pickup";[20] have no probative value. As the Examining Attorney points out, "Applicant's declarations do not include a single demonstration of how the average customer for guitar pickups would recognize the color cream (without any other wording or reference to configuration) as a source-identifying mark in conjunction with guitar pickups…."[21]

Applicant also provided evidence of its enforcement activities related to Registration No. 1169205 for a hybrid product configuration-color mark (depicted below) – referred to hereafter as a "product configuration mark with color"[22] – for the same goods, and described as consisting of "the double design representation of an electronic sound pickup for guitars, which is disclaimed apart from the mark as shown[] AND IS LINED FOR THE COLOR YELLOW WHICH RESEMBLES THE

---

[20] *Id.*

[21] 12 TTABVUE 10 (Examining Attorney's Brief).

[22] Registration No. 1169205 features "the color yellow which resembles the distinctive shade of cream," and shows that the mark includes the outline of the double-pickup configuration but then disclaims the configuration. It is not simply a color mark because the disclaimed matter is still part of the mark. Nor is it simply a product configuration mark because protection extends only to the specified color, albeit only as applied to that double configuration shape.

DISTINCTIVE SHADE OF CREAM.":[23]



Just as the declarations Applicant submitted are not probative because they pertain to a product configuration mark, neither are its enforcement activities because they too are related to a hybrid product configuration mark with color. Accordingly, we cannot conclude that the alleged infringers (or copiers) believed that consumers would perceive the proposed color mark in this application as a source identifier on its own. *In re Fantasia Distrib., Inc.*, 120 USPQ2d 1137, 1145-46 (TTAB 2016) ("Because the copying in this instance is not limited to the diamond pattern alone, it does not show that the copier perceived the diamond pattern by itself as a source indicator or believed that consumers would rely on the diamond pattern as an indicator of the source of the goods.").[24]

---

[23] March 12, 2019 Response to Office Action, TSDR 45 (registration certificate), 171-234, (including cease and desist letters and settlement agreements). Applicant argued during prosecution that its ownership of Registration No. 1169205 "for the color cream on another form of a double coil guitar pickup –a 6 per coil piece pickup" "further strengthens Applicant's position" that its proposed mark has acquired distinctiveness of the proposed mark in this application. *Id.* at 20. However, due to the differences between the mark in the prior registration, which includes the product's configuration that while disclaimed is still part of the mark, the prior registration itself is also not probative of acquired distinctiveness of the proposed color mark alone in this case, contrary to Applicant's argument during prosecution. *Id.* at 20.

[24] Nor could we conclude that settlement agreements obtained by Applicant, even if they did refer to the claimed color mark at issue, were probative of the distinctiveness of the mark as opposed to the referenced third parties' desire to avoid litigation. *See generally In re Wella Corp.*, 565 F.2d 143, 196 USPQ 7, 8 n.2 (CCPA 1977) ("Appellant argues that various letters (of record) from competitors indicating their discontinuance of use of its mark upon threat of legal action are evidence of its distinctiveness, but we agree with the TTAB that such

### B. Length, Degree, and Exclusivity of Use of the Proposed Mark

Applicant asserted during prosecution that it "has been selling … pickups embodying the Mark, since 1979,"[25] and that "[m]illions of consumers have **or will** observe Applicant's goods in videos, photographs, advertisements, and during live musical performances."[26] However, as the Examining Attorney notes, citing TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) §§ 1202.05(a) and 1212.06, "a mere statement of long-time use of the color mark is not sufficient; an applicant must provide evidence demonstrating that the color mark has acquired source indicating significance in the minds of consumers," and "[a]lthough Applicant appears to have used [the color] cream on its pickups for a lengthy time, the evidence of record does not establish that applicant's use is substantially exclusive or that relevant consumers associate that color in applicant alone as required by Trademark Act Section 2(f)."[27] *See, e.g.*, *In re Benetton Grp. S.p.A.*, 48 USPQ2d 1214, 1216-17 (TTAB 1998) (despite long use, record devoid of any evidence that the green rectangular background design has been used, promoted, or advertised as a mark).

"The Examining Attorney's evidence show[s] that applicant's use of the cream color on guitar pickups is not substantially exclusive," and that "third party use of

---

evidence shows a desire of competitors to avoid litigation rather than distinctiveness of the mark").

[25] November 6, 2017 Response to Office Action, TSDR 15.

[26] March 12, 2019 Response to Office Action, TSDR 20 (emphasis added). Many of the factual assertions made by Applicant during prosecution are unsupported by evidence. "Attorney argument is no substitute for evidence." *Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1799 (Fed. Cir. 2018) (quoting *Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276, 76 USPQ2d 1616, 1622 (Fed. Cir. 2005)).

[27] 12 TTABVUE 7, 20 (Examining Attorney's Brief).

the same color on the same goods calls into question the ability of the color [cream] to identify a single source:"[28] For example, the following guitar or pickup manufacturers offer or have offered cream colored electronic sound pickups for guitars:

<u>Kiesel Custom Guitars</u>[29]



<u>Seymour Duncan</u>[30]





Seymour Duncan Antiquity for Strat Texas Hot Custom Bridge Pickup

---

[28] *Id.* at 13.

[29] September 13, 2018 Office Action, TSDR 35-36 (emphasis added by the Examining Attorney).

[30] *Id.* at 37-40, 47, *



Seymour Duncan SHR-1b Hot Rails for Strat
Cream

### Cimar Electric Guitars[31]



### Bill Lawrence[32]



---

[31] *Id.* at 70 (guitar-compare.com, emphasis added).

[32] *Id.* at 63 (guitarcenter.com).

<u>Dragonfire Crusader</u>[33]



<u>Guitar Madness</u>[34]



<u>Yibuy</u>[35]



---

[33] *Id.* at 41 (ebay.com, emphasis added).

[34] *Id.* at 45-46 (reverb.com, emphasis added).

[35] *Id.* at 54 (amazon.com, emphasis added).

Fantastic[36]



GFS[37]





---

[36] *Id.* at 51 (amazon.com).

[37] *Id.* at 59-62 (guitarfetish.com, emphasis added).

Gino Guitars[38]



Tradition Guitars[39]



Applicant itself provided evidence of competitors using the color cream on guitar pickups such as those shown below:[40]

[38] September 27, 2019 Office Action, TSDR 22 (ginoguitars.com).

[39] *Id.* at 38-39 (emphasis added by Examining Attorney).

[40] *See, e.g.*, March 12, 2019 Response to Office Action, TSDR 295, 311.

|                        JBE                        |                     Fishman                     |
| :-----------------------------------------------: | :---------------------------------------------: |
|                               |                             |

As the Examining Attorney observes, "[t]his evidence contradicts applicant's claim that the color cream has come to identify a single source of guitar pickups."[41] *See ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 97 USPQ2d 1048, 1057-58, nn.4 & 5 (Fed. Cir. 2010) (where a competitor also used the color blue for its competing products, plaintiff could not show the required exclusive use of the color blue that was required to demonstrate secondary meaning); *In re Boston Beer Co.,* 198 F.3d 1370, 53 USPQ2d 1056, 1058 (Fed. Cir. 1999) ("The examples of use of the phrase by others in its descriptive form support the board's conclusion that the mark had not acquired distinctiveness."); *Cicena Ltd. v. Columbia Telecommc'ns Grp.*, 900 F.2d 1546, 14 USPQ2d 1401, 1407 (Fed. Cir. 1990) ("evidence point[ing] strongly away from a finding of secondary meaning" included "the existence of other similar telephone designs which compete with the ROXANNE design"); *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 222 USPQ 939, 940-41 (Fed. Cir. 1984) ("When

---

[41] 12 TTABVUE 15 (Examining Attorney's Brief).

the record shows that purchasers are confronted with more than one (let alone numerous) independent users of a term or device, an application for registration under Section 2(f) cannot be successful, for distinctiveness on which purchasers may rely is lacking under such circumstances."); *Guaranteed Rate*, 2020 USPQ2d 10869, at *7-8 ("The copious evidence of third-party use of 'guaranteed rate,' 'guaranteed mortgage rate,' and 'guaranteed interest rate' in connection with mortgage lending services weighs heavily against Applicant's claim of acquired distinctiveness."); *Sheetz of Del., Inc. v. Doctor's Assocs. Inc.*, 108 USPQ2d 1341, 1370 (TTAB 2013) ("[W]idespread use of 'Footlong' demonstrated by this record would itself be sufficient to dispose of applicant's claim of acquired distinctiveness.").

Applicant concedes that the color cream is used on third-party guitar pickups, but contends that the Examining Attorney's evidence shows the wrong shade of cream. Specifically, Applicant argues that:

> [T]he evidence provided by the examiner tends to show that other shades of a cream color have been used in conventional double coil pickups; this evidence does not in any way contradict the exclusive use of Applicant's distinctive cream color. The 'distinctive color cream' as discussed in the Description of Mark is a color created by Applicant itself in the 1970s, which is not a Pantone shade, and is thus not consistent with other products that have used cream colors with rail designs.[42]

This argument is unavailing. Applicant's self-serving description of its claimed mark as "the **distinctive** color cream applied to the entire surface of the goods" cannot be used to restrict the likely public perception of the claimed mark. A mark's meaning is based on the impression actually created by the mark in the minds of

---

[42] 13 TTABVUE 4 (Applicant's Reply Brief).

consumers, not on the impression that the applicant states the mark is intended to convey. *See* TMEP § 808.02 (July 2021). As Applicant points out, it did not use a commercial color identification system, such as Pantone, to identify its claimed color. Thus, even if the shades of the third-party cream-colored pickups vary somewhat from Applicant's self-styled "distinctive" shade, those uses, at minimum, are of a substantially similar shade of cream, *i.e.*, shades close enough in appearance to impair Applicant's "ability to show that its proposed color mark has acquired distinctiveness in that market." *Milwaukee Elec. Tool*, 2019 USPQ2d 460354, at \*25 ("Milwaukee's evidence showing use of the color red on saw blades by it and third parties is probative to establish that Freud's use of the color red on reciprocating saw blades has not been substantially exclusive . . . ."); *cf. In re Medline Indus., Inc.*, 2020 USPQ2d 10237, at \*7 (TTAB 2020) (third-party non-trademark uses of various shades of green on medical gloves corroborated the weakness of the cited registered shade of green for likelihood of confusion purposes).

Notably, the shades of cream in some of the pickups shown in the Examining Attorney's third-party use evidence—which Applicant decries are the wrong shade of cream—are quite similar to the shades of cream used on pickups Applicant considered infringing in its enforcement efforts.[43] At the same time, the shade(s) of cream actually used by Applicant appears to be different from the shade(s) of cream shown in the drawing:[44]

---

[43] *See* March 12, 2019 Office Action Response, TSDR 191-92, 204-10, 216-17.

[44] At the same time, we acknowledge and bear in mind that any comparison between different shades of color may be affected somewhat by the computer technology (computer monitors,

"Cream" as Shown on Drawing[45]



"Cream" as Shown on Applicant's Specimens of Use[46]



These facts deflate Applicant's contention that the difference in shade in the third-party uses of record are significant with regard to Applicant's claim to have made exclusive use of a "distinctive" shade of cream for purposes of establishing acquired distinctiveness.

Applicant also refers to its description of the proposed mark to argue that the

---

etc.) available to the viewer. Nonetheless, the differences in the shades in Applicant's drawing and its specimen appear to be markedly different. Applicant's inability or unwillingness to use a commercial coloring system to describe its claimed color leaves some doubt as to the actual color claimed. *See* TMEP § 808.02 ("[C]ommercial color identification systems … may appear in connection with a color identifier in the description of the mark, because greater precision in identifying the color may be critical in accurately describing the mark[.]"). *See also In re Int'l Flavors & Fragrances Inc.*, 183 F.3d 1361, 51 USPQ2d 1513, 1517-18 (Fed. Cir. 1999) (registration must accurately provide notice to the public of the mark as used in commerce).

[45] *Id.* at 18.

[46] October 24, 2016 Application, TSDR 7.

third-party uses of record show use of the color cream on the wrong kind of guitar pickups and therefore are not probative. As Applicant explains:

> [T]he Mark [is] … "applied to the entire surface of the goods," the goods themselves being "electronic sound pickup[s] for guitars featuring a double coil design." As shown by the specimen, the Mark does not apply to use on conventional double coil pickups—which have a set number of pole pieces—but only to double coil wide rail pickups, which are not similarly hampered by a set of pole pieces. While the configuration of the pickup is not itself part of Applicant's Mark—meaning that the double coil design itself is not being trademarked—the application seeks to trademark the cream color *as applied to the double coil rail pickup specifically*, not to every use of a double coil pickup.[47]

This argument is also unavailing. "The authority is legion that the question of registrability of an applicant's mark must be decided on the basis of the identification of goods set forth in the application regardless of what the record may reveal as to the particular nature of an applicant's goods," *Octocom Sys, Inc. v. Hous. Comput. Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990). Applicant's goods are identified simply as "electronic sound pickup for guitars", not "double coil rail pickups." Further, we cannot assume that consumers of Applicant's goods will be aware that Applicant restricts its use to a particular type of electronic sound guitar pickup as mentioned in the description of the mark, so Applicant's actual use is not pertinent to our analysis. *See In re Dolce Vita Footwear, Inc.*, 2021 USPQ2d 479, at *11 (TTAB) ("We cannot assume that consumers of Applicant's goods will be aware that its identification is so restricted [to exclude transparent goods], and the restriction is not controlling of public perception" of the applicant's Class 18 goods

---

[47] *Id.* at 3 (citations omitted, emphasis in original).

sold under the CLEAR mark), *appeals docketed*, Nos. 21-2114, -2115 (Fed. Cir. July 1, 2021); *In re Aquitaine Wine USA, LLC,* 126 USPQ2d 1181, 1187-88 (TTAB 2018). *Cf. In re Wada*, 48 USPQ2d 1689, 1692 (TTAB 1998) (public is unaware of disclaimers that "quietly reside" in the records of the Office), *aff'd*, 194 F.3d 1297, 52 USPQ2d 1539 (Fed. Cir. 1999).

As the Examining Attorney notes, "Applicant's various objections and distinctions between 12-pole piece pickup configurations and rail configurations and single coil designs are irrelevant when (1) this application is for a color mark not a configuration mark and (2) applicant has applied for the mark as used on all types of electronic sound pickups for guitars regardless of configuration."[48] If Applicant wanted to restrict the scope of its goods in the application to pickups "featuring a double-coil design," it could have done so by amending the identification of goods to limit them as such, but Applicant did not do so. Applicant may not avoid the consequences of its chosen identification of goods by claiming that its description of the proposed mark limits the goods as identified. In any event, even if the description and drawing limit the mark to double coil rail-style designs, the third-party uses on other types of electronic sound pickups remain probative inasmuch as they fall within Applicant's identification of goods and evidence consumer exposure to multiple sources using the color mark on other types of pickups.

In sum, we agree with the Examining Attorney that "[b]ecause many parties offer

---

[48] 12 TTABVUE 19 (Examining Attorney's Brief).

cream colored pickups, the mark does not appear to be distinctive of the goods."[49] Applicant has not shown substantially exclusive use of the color cream on electronic sound pickups for guitars.

### C. Amount and Manner of Advertising

Applicant provided numerous examples of its advertising of electronic sound pickups for guitars,[50] asserting that it "spent money to publicize its Mark via advertisements in various media and promotional activities [sic] in the United States, including but not limited to prominent magazines in the musical industry – both consumer and trade, websites, endorsements, and tradeshows. Applicant's advertisements and promotional materials for its goods feature prominent images of the mark."[51]

However, as noted by the Examining Attorney, Applicant's promotion of its goods "do[es] not actually include any 'look-for' advertising or reference to the color cream at all."[52] "'Look for' advertising directs the potential consumer in no uncertain terms to look for a certain feature to know that it is from a particular source. It does not refer to advertising that simply includes a picture of the product or touts a feature in a non-source identifying manner." *Kohler*, 125 USPQ2d at 1517 (quoting *Stuart Spector Designs*, 94 USPQ2d at 1572, which found that prominent "beauty shots" of

---

[49] *Id.* at 18.

[50] *See, e.g.,* November 6, 2017 Response to Office Action, TSDR 20-39, 42-43, 44-45, 48-49, 51, 53, 55, 57, 59, 61-72, 74-113, 119-30; March 12, 2019 Response to Office Action, TSDR 56.

[51] November 6, 2017 Response to Office Action, TSDR 15.

[52] 12 TTABVUE 18 (Examining Attorney's Brief).

a guitar body shape were not examples of "look-for" advertising and were not probative of acquired distinctiveness); *Cf. Owens-Corning*, 227 USPQ at 423-24 (the applicant's advertising featuring taglines referring to the color pink, such as "Put your house in the pink" and "Think pink," licensing of the "Pink Panther" mascot, and use of pink promotional items to associate the color with the applicant, were important parts of its showing that pink had acquired distinctiveness as its mark for fiberglass insulation).

Applicant does not dispute that it has no "look-for" advertising, but asserts that advertisements "can convey the same message without explicit 'look-for' language, as is the case here. … While perhaps 'look-for' advertising could constitute other evidence of acquired distinctiveness, it is by no means a requirement to show such distinctiveness."[53] We agree with Applicant that "look-for" advertising is not a requirement to prove acquired distinctiveness, and that other evidence may suffice. For example, in *Stuart Spector Designs*, we acknowledged that "[t]here are cases where the lack of 'look for' advertising [is] not fatal in view of industry practice to recognize certain configurations as source indicators." *Stuart Spector Designs*, 94 USPQ2d at 1574. However, the record does not show this to be one of those cases. Applicant's website promotion of its double coil wide rail pickups provided with its XPN DP102 model pickups is illustrative:[54]

---

[53] 13 TTABVUE 6 (Applicant's Reply Brief).

[54] November 6, 2017 Response to Office Action, TSDR 119.



The advertisement characterizes the claimed cream color mark as one of many "Color Options" for Applicant's goods. In fact, consumers may order the same pickups in the following colors: black, black/cream, white, blue, green, pink, purple, yellow, black/white, black/blue, black/green, black/pink, black/purple, and black/yellow. Hence, there is nothing about the color cream in Applicant's advertising that would

cause consumers to perceive that particular color as a mark. To the contrary, this promotion suggests that it is one of numerous ornamental color options.

Applicant argues that "the Examiner does not appear to have provided any legal authority that holds [that] ... the fact that a product is available in other colors precludes a finding that the … cream color is afforded trademark protections." The Examining Attorney has not taken such a position. Certainly, a particular color may be provided trademark protection if it is shown to have acquired distinctiveness even if the goods may appear in other colors. However, the fact that the color cream is not touted at all in Applicant's advertising, coupled with the fact that cream is just one of many colors offered for Applicant's goods, strongly undercuts Applicant's claims that the color cream is promoted as a mark and would be perceived as one by consumers.

Overall, we find that Applicant's advertising falls far short of adequately supporting its claim of acquired distinctiveness.

### D. Amount of Sales under the Mark

Applicant claimed during prosecution, without supporting evidence, that "since 1979, [it] has sold over thirty thousand 30,000 units embodying the Mark."[55] Applicant, however, did not provide further details regarding its purported sales, including how they compare to those of Applicant's competitors, because, as it explained, its "exact sales figures for the double-cream pickup embodying the Mark

---

[55] *Id.* at 16.

are confidential."[56] Applicant's claim therefore amounts to nothing more than attorney argument, which is not probative. *Cai*, 127 USPQ2d at 1799. Moreover, "[i]n the absence of supporting evidence, we cannot find that Applicant has [sold its goods] extensively." *In re Sausser Summers, PC*, 2021 USPQ2d 618, at *19 (TTAB 2021) (finding that the applicant's claims to have engaged in "vast and worldwide advertising" and to have spent "a substantial amount in advertising each year" were not credible where the applicant declined to disclose any figures because they "would be a significant advantage to our competitors.").

### E. Unsolicited Media Attention

Applicant did not provide any evidence properly of record of unsolicited media attention, the sixth *Converse* factor, related specifically to the color cream.

## IV. Conclusion and Decision

As discussed, single-color marks on products are never inherently distinctive and may not be registered without a substantial showing of acquired distinctiveness. Having carefully reviewed the evidence, we find that Applicant has not met its burden of proving a prima facie case of acquired distinctiveness in the color cream for electronic sound pickups for guitars. The refusal to register under Trademark Act Sections 1, 2, and 45 is therefore affirmed.

---

[56] *Id.*